UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
GREGORY SERIO, Superintendent
of Insurance of the State of
New York, as Rehabilitator of     :     MEMORANDUM & ORDER
FRONTIER INSURANCE COMPANY,       :
                                        05 Civ. 15 (MHD)
                Plaintiff,        :

        -against-                 :

BLACK, DAVIS & SHUE AGENCY,       :
INC.,
                                  :
                Defendant.
-------------------------------x

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:


    The Insurance Superintendent of the State of New York

commenced this lawsuit earlier this year in his capacity as the

court-appointed rehabilitator of Frontier Insurance Company

("Frontier").[1] He seeks by this litigation to recover premiums

allegedly owed to Frontier by defendant Black Davis and Shue Agency

("BDS") under an agency contract that authorized BDS to place

certain types of insurance with Frontier and required BDS to

collect and transmit premiums to the carrier.


    With discovery ongoing, plaintiff has moved for a preliminary

_____

    [1] When this suit was filed, Gregory V. Serio was the
Insurance Superintendent. He subsequently left office and was
succeeded as acting Superintendent by Howard Mills, who thereby
succeeded to the position of plaintiff in this case. See Fed. R.
Civ. P. 25(d)(1).

1

injunction to compel defendant to deposit with the court a sum of money, in excess of three million dollars, which is said to represent premiums paid by four insureds to defendant, as the agent of Frontier, and which defendant failed to transmit to Frontier. The stated basis for the motion is plaintiff's concern that defendant, as a fiduciary of Frontier, not only failed to account for these funds, but has been dissipating them and is likely to be unable to satisfy a judgment that plaintiff seeks in this litigation.

Defendant has opposed the motion, asserting that plaintiff is unable to satisfy any of the requirements for preliminary injunctive relief of this kind. We have reviewed the submitted papers and conducted a hearing at which the parties were invited -- but declined -- to supplement the record with either direct testimony or cross-examination. On the basis of the evidentiary submissions and the extended written and oral arguments of counsel, we conclude that plaintiff has satisfied the requisites for relief, and accordingly grant the motion in substantial part.

A. <u>The Nature of the Case</u>
<u>And the Evidentiary Record</u>

Frontier was initially incorporated in 1962 under the name P.T.F. Health Insurance Co. (Declaration of H. Neal Conolly, Esq.,

executed June 1, 2005, at ¶ 11). In 1977 its name was changed to Frontier, and it began to perform as an insurance carrier. (Id. at ¶¶ 12, 14). Frontier's operations proved relatively profitable, and in 1986 it was acquired by the Frontier Insurance Group, Inc. (Id. at ¶¶ 16-17).

This lawsuit arises from financial disputes occasioned by an insurance program designed to provide workers compensation coverage for so-called professional employer organizations ("PEOs"). The inspiration for this insurance program apparently came from an individual named William Haines, who had approached BDS to set up the program. As part of this proposed arrangement, Haines and two of the principals of BDS -- Tim Black and Tom Black -- established a reinsurance company, known as Congressional Re (see PX C)[2], and BDS contacted Frontier to persuade it to participate by issuing policies for the program.

As a result, on or about October 1, 2000 Frontier entered into a written agency contract with BDS under which it was agreed that

---

[2] Tim and Tom Black received, between them, either 2,500 or 3,500 shares, representing at least a 25 percent interest in Congressional Re, and Haines received the balance of the shares. (PX E at 153; PX D at 113-14). (The minutes of the initial Congressional Re Board meeting are inconsistent in reporting the issuance of 10,000 shares and the distribution to the Blacks of 3,500 shares, with 7,500 shares going to Haines. See PX C at first and third pages).

BDS would serve as Frontier's agent for purposes of soliciting business for the PEO program and managing the program. (Agency Agreement § Two).[3] The specific responsibilities assigned to BDS included locating potential insureds, binding and writing policies, and handling the necessary paperwork. (Id. §§ Two, Four & Five). BDS was also required to collect premiums and transmit them to Frontier, less a ten-percent commission. (Id. §§ Four, Seven, Eight & Fifteen). The agreement specifically provided that, in undertaking these activities, BDS was acting as a trustee and fiduciary for Frontier, and that it was required to place the proceeds of the premiums in a special account for the benefit of Frontier and was to pay to Frontier all premiums due under the policies, whether collected or not. (Id. § Eight). The contract further provided that the proceeds belonged solely to Frontier and that BDS was not to apply these funds for its own purposes. (Id. § Eight).

At about the same time and in connection with this transaction, Frontier entered into a reinsurance agreement with Congressional Re. (DX 11). Under its terms, Congressional Re was to provide reinsurance for Frontier's policies, and Frontier was obligated to pay Congressional Re a reinsurance premium calculated

---

[3] The Agency Agreement is annexed as exhibit A to the declaration of Laurie J. Weiss, executed November 9, 2005.

on the basis of a percentage of the premiums received from its insureds. (Id. at p. 8).

Although Frontier's business had expanded considerably through 1996, by the late 1990s its financial situation had deteriorated, and by the first quarter of 2000 it operated at a loss of $13.6 million. (Conolly Decl. at ¶¶ 22, 24). With a net loss of more than $50 million in 2000, Frontier was examined by the Insurance Superintendent, who reported that, as of year-end 1999, Frontier was insolvent in the amount of $145,736,693, that its capital was impaired by $150,736,693, and that its required surplus was impaired by $152,436,693. (Id. at ¶ 28).[4]

On March 1, 2001 the New York Insurance Department ordered Frontier to show cause why it should not be subjected to regulatory action, and on March 12 the company stipulated with the Department that its surplus was inadequate in relation to its liabilities and current financial needs. It further agreed not to write any new or renewal insurance policies until authorized by the Department. (Id. at ¶¶ 31-32).

Frontier promptly announced that it was withdrawing from the

_____

[4] The Superintendent also determined that, for the same time period, Frontier had understated its liabilities by $267,181,000. (Id. at ¶ 29).

5

business (DX 25), and on March 15, 2001 it advised BDS that it was terminating the Agency Agreement. (DX 24).[5] Under the terms of that contract, however, the parties were obliged to continue to deal with existing insurance business (Agency Agreement § 25(I-K)), and Frontier reiterated that fact in its notice to BDS, stating that "[i]t is expected that your agency will continue to honor its contractual commitments and continue handling billing, audits and endorsement activity." (DX 24). The notice did advise BDS that "[a]ny binding authority you may have had is revoked immediately pursuant to our arrangement to stop writing new and renewal business." (Id.).

On August 24, 2001, the Superintendent commenced a rehabilitation proceeding in New York State Supreme Court, New York County, under Article 74 of the New York Insurance Law. (Conolly Decl. at ¶ 34). The court appointed the Superintendent as Frontier's temporary receiver. (Id. at ¶ 35 & Ex. A). On October 15, 2001 the court issued an order designed to govern the rehabilitation process. Under its terms, the court deemed Frontier to be insolvent and authorized the Superintendent

---

[5] Prior to that termination notice, Frontier had sent letters to BDS in February and March 2001, advising defendant of perceived deficiencies in the performance of BDS under the Agency Agreement and warning that it would terminate the contract by March 16. (See DXs 14, 17, 18).

> to immediately take possession of its property, conduct its business, including but not limited to settling claims within his sole discretion, take such steps toward the removal of the causes and conditions which made this proceeding necessary as he shall deem wise and expedient, and deal with the property and business of [Frontier] in its name or in the name of the Superintendent as Rehabilitator.

(Id., Ex. A at p. 2). The order further provided that "[a]ll persons are enjoined and restrained from commencing or prosecuting any actions, lawsuits, or proceedings against [Frontier] or the Superintendent as Rehabilitator". (Id., Ex. A at p. 3). As further protection, the court ordered that "[a]ll persons are enjoined and restrained from obtaining preferences, judgments, attachments or other liens or making any levy against [Frontier's] assets or any part thereof." (Id.).

The Superintendent authorized the filing of this lawsuit in federal court as part of his effort to marshal the assets of the carrier. Asserting claims for breach of contract, violation of a covenant of good faith and fair dealing, and breach of fiduciary duties, plaintiff contends that BDS has failed to remit to Frontier a substantial amount of premium payments received from insureds under the PEO program, and he seeks recovery of a sum that he currently estimates may total between six and seven million dollars. (Dec. 9, 2005 Tr. at 2-3). The complaint was filed in January 2005, apparently after some unsuccessful efforts to

negotiate a resolution based on a review of financial records maintained by Frontier and BDS. The filing of the complaint triggered a series of counterclaims by BDS, which contends that Frontier breached the Agency Agreement in various respects and committed a number of common-law torts.

By decision dated October 11, 2005, we granted a motion by the Superintendent to stay defendant's various counterclaims, holding that Burford abstention was appropriate to ensure that the pending state-court rehabilitation proceeding be the sole forum for the assertion of claims against the estate of Frontier. The court specified, however, that in litigating plaintiff's claims for unpaid premiums, BDS would be permitted to prove its earned commissions as a set-off to the amounts due to Frontier as premiums. Serio v. Black, Davis & Shue Agency, Inc., 2005 WL 2560390, *3-6 (S.D.N.Y. Oct. 11, 2005).

As for the state-court proceeding, the process of rehabilitation continues. According to the Administrator of Frontier, who was appointed by the Superintendent in 2002, it is still not clear whether the company will emerge from rehabilitation as a functioning carrier or will be required to go to liquidation. (Conolly Decl. at ¶¶ 2, 4).

B. <u>The Preliminary Injunction Motion</u>

Only weeks after the issuance of our decision staying defendant's counterclaims, plaintiff moved by order to show cause for a preliminary injunction (1) compelling BDS to deposit in the registry of the court "all premiums collected by B,D&S with respect to the insurance policies at issue in this litigation" and (2) "restraining B,D&S from transferring, dissipating or otherwise disposing of any of the premiums collected by B,D&S with respect to those policies". (Order to Show Cause dated Nov. 14, 2005). By agreement of the parties, the return date of the motion, originally set for November 22, 2005, was adjourned to December 9, 2005.

In justifying his motion, plaintiff first contends, based on the terms of the Agency Agreement and the New York Insurance Law, that Frontier has an equitable interest in the collected premiums. He further points out that defendant had failed to turn over most of these funds to Frontier, a contention supported by defendant's interrogatory answers, which concede that, with respect to the four insureds under the PEO program that were approved by Frontier, BDS received $3,651,935.79 in premiums and remitted to Frontier only $597,000.00. (<u>See</u> Weiss Decl. at ¶¶ 9-10; PX A at pp. 2-4; PX B at pp. 2-5).

Plaintiff further asserts that defendant has dissipated some of the premium funds that belong to Frontier. In support of this contention, he points out that, during a May 6, 2005 court conference, Robert Howell, a senior representative from the defendant[6], confirmed to the Court that BDS had originally collected more than three million dollars in premiums on four PEO policies issued by Frontier, and that at some point after the termination of the agency contract it had transferred more than 1.5 million dollars from those funds to Congressional Re, an entity owned and controlled by the two Mr. Blacks and by Mr. Haines, and that Congressional Re had in turn disbursed these funds to the three controlling owners of the company, a set of payments originally described by the reinsurer as "dividends" and then later re-labeled as "loans". (Declaration of Nicholas J. Puleio, executed Nov. 9, 2005, at ¶¶ 6-13). Plaintiff further documents the fact that in the course of discovery over the last five months BDS has confirmed the transfer to Congressional Re.

Apart from noting this alleged dissipation of the funds in question, plaintiff seeks to demonstrate that injunctive relief is needed to avert irreparable harm caused by the likely inability of the defendant to satisfy a judgment. Thus, he points to an

---

[6] Howell is the President of International Captive Programs for BDS. (Declaration of Robert Howell, executed Nov. 21, 2005, at ¶ 1).

affidavit provided by Mr. Howell in opposition to the stay motion, in which Howell represented that if plaintiff obtained the relief that it sought in this litigation –- an award of as much as eight million dollars –- the defendant would face financial ruin. In further support of plaintiff's contention that he faces irreparable harm because of defendants' likely inability to satisfy a possible judgment, the Superintendent cites the fact that BDS is a defendant in numerous lawsuits around the country growing out of an alleged fraud committed by parties who sold unauthorized policies under the PEO program, and that defendant's insurance carrier has disclaimed coverage. Finally, plaintiff observes that Mr. Howell, who is, as noted, a senior official in the company, has recently filed a personal bankruptcy petition and in that petition lists as creditors, not only BDS and Haines, but a number of PEOs that were sold insurance policies or claim to have been defrauded through the sale of bogus policies as part of the PEO program.

In response to the motion, defendant proffers evidence designed to show that plaintiff has little prospect of success in the lawsuit and that he has failed to show the requisite irreparable harm. In attacking the merits of plaintiff's claims, defendant first argues that the agency contract with Frontier was void ab initio (and implicitly asserts that it therefore imposed no obligations on BDS with respect to the premium funds). Defendant

also seeks to show that plaintiff breached the contract in numerous respects.

Defendant's principal argument on the merits of plaintiff's claims, however, appears to be that Frontier amended the agency contract to permit BDS to transmit funds directly to Congressional Re, thereby fulfilling Frontier's obligation to obtain reinsurance and ensuring that Congressional Re would have the funds to pay off claims on the various PEO policies. The point seems to be that defendant's transfer of premium funds to Congressional Re was permitted by the allegedly amended contract and indeed was essential to keep the program functioning.

In a further attack on the merits of plaintiff's claim, defendant asserts that the contract was also amended to shift the obligation of conducting premium audits from BDS to Frontier, and that the net effect of these two contractual amendments is to alter dramatically the calculation of moneys owed between Frontier and BDS, possibly leading to a net amount owed by Frontier to BDS. In pursuing this analysis, defendant acknowledges that the court has stayed its counterclaims, but BDS takes issue with the fairness of that result, contending that it has left BDS exposed to litigation by dissatisfied policy holders, while preventing the company from pursuing Frontier for its responsibility for the insureds' claims.

As for irreparable harm, defendant challenges the adequacy of plaintiff's showing. With regard to the asserted dissipation of funds, defendant contends, as noted, that the fund transfer to Congressional Re was proper under the alleged amendment of the contract and in fact inured to the benefit of Frontier. As for the ability of BDS to satisfy a judgment, defendant argues that the cited Howell affidavit on the stay motion referred only to the prospect of an eight-million-dollar judgment, and it asserts that plaintiff has not demonstrated that BDS would be unable to meet a judgment for the approximately three million dollars assertedly owed on the four policies in question on the current motion.


ANALYSIS


_____Plaintiff seeks what it styles a preliminary injunction. We first address the criteria governing Rule 65 applications designed to interfere <u>pendente</u> <u>lite</u> with a litigant's control of its own financial assets. We then turn to an assessment of plaintiff's motion.


_____A. <u>Standards Governing an Asset Freeze</u>


When a plaintiff in federal court believes that his adversary is dissipating, diverting or hiding assets and that this activity

is intended to prevent, or will have the effect of frustrating, enforcement of a judgment that has not yet been entered, he is typically required to look to the terms of Fed. R. Civ. P. 64 for relief. That rule refers the litigant to state-law remedies for "seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered."[7]

Under New York law, plaintiff in this case might have opted for a provisional remedy of attachment under Article 62 of the New York Civil Practice Law and Rules. To do so, however, plaintiff would have to demonstrate that

> the defendant, with intent to defraud its creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff[']s favor, has assigned, disposed of, encumbered or secreted property or removed it from the state or is about to do any of these acts . . . .

N.Y. Civ. P. L. & R. 6201(3). If plaintiff can make this showing, he must also

---

[7] The Rule states in pertinent part, that

At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held existing at the time the remedy is sought . . . . The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether by state procedure the remedy is ancillary to an action or must be obtained by an independent action.

> show, by affidavit and such other written evidence as
> may be submitted, that there is a cause of action, that
> it is probable that the plaintiff will succeed on the
> merits . . . and that the amount demanded from the
> defendant exceeds all counterclaims known to the
> plaintiff.

N.Y. Civ. P. L. & R. 6212(a). Even if plaintiff satisfies these
statutory criteria, the court retains discretion whether to grant
the requested relief, "and since attachment is a harsh remedy, the
'court must exercise care in its application.'" Sequa Corp. v.
Gelmin, 1995 WL 404726, *3-4 (S.D.N.Y. July 7, 1995)(quoting
Merrill Lynch Futures, Inc. v. Kelly, 585 F. Supp. 1245, 1259
(S.D.N.Y. 1984)).

Not surprisingly, plaintiff has eschewed this remedy,[8] and
instead pursues injunctive relief under Fed. R. Civ. P. 65. That
approach involves a somewhat different array of challenges for the
movant, but in a narrow range of circumstances the applicable
standards may be somewhat easier to meet.

As a general matter, preliminary injunctive relief will not be
granted unless the movant demonstrates "irreparable harm, and
either a likelihood of success on the merits, or sufficiently
serious questions going to the merits to make them a fair ground

---

[8] The standard embodied in the CPLR not only is arguably more
stringent than that under Rule 65, see id. at *4, but it risks
bringing back into the litigation the very counterclaims against
which plaintiff recently obtained a stay.

for litigation and a balance of hardships tipping decidedly in [his] favor." Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 478-79 (2d Cir. 1995)(quoting Polymer Technology Corp. v. Mimran, 975 F.2d 58, 61 (2d Cir. 1992)). If the relief sought by the movant would involve a mandatory injunction, as distinguished from prohibitory relief, the plaintiff must show not merely a likelihood of success, but a high likelihood of success on his claims. See Beal v. Stern, 184 F.3d 117, 122 (2d Cir. 1999). It also bears mention that "courts of equity 'will go much farther both to give and to withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 326 (1999)(quoting United States v. First Nat'l City Bank, 379 U.S. 378, 383 (1965)).

Because plaintiff is seeking to enjoin defendant from accessing some of its assets during the litigation, plaintiff must satisfy one additional requirement. The Supreme Court has held that a mid-litigation injunction against a transfer of assets is not permissibly entered in a lawsuit for money damages unless the movant has a lien or other equitable interest in the assets sought to be frozen or sequestered. See id. at 318-33. In short, a party seeking a money judgment may not obtain a freeze of the defendant's assets based simply on the prospect that the defendant may

otherwise be unable to satisfy the judgment that will later be entered. See id. at 333; see also DeBeers Consolidated Mines Ltd. v. United States, 325 U.S. 212, 218-23 (1945). It follows that, to obtain such relief, the movant must satisfy the court that he is asserting an equitable claim in this proceeding and that the injunctive relief that he is seeking is related to that claim, or, alternatively, that he should be deemed to have an equitable lien, or other interest enforceable in equity, on the assets that he seeking to attach or otherwise freeze. See, e.g., SEC v. ETS Payphones, Inc., Inc., 408 F.3d 727, 734-35 (11th Cir. 2005); JSC Foreign Economic Ass'n Technostroyexport v. Int'l Development & Trade Servs., Inc., 295 F. Supp.2d 366, 387-89 (S.D.N.Y. 2003). See also Deckert v. Independence Shares Corp., 311 U.S. 282, 287-91 (1940); Republic of Philippines v. Marcos, 806 F.2d 344, 355-56 (2d Cir. 1986).

### B. Evaluation of Plaintiff's Motion

We first address the question of whether plaintiff can surmount the hurdle posed by Grupo Mexicano and then assess his compliance with the balance of the preliminary-injunction requirements. We conclude that preliminary injunctive relief is warranted, although of a more limited nature than requested by plaintiff.

1. <u>The Availability of Preliminary Equitable Relief</u>

Plaintiff notes that in pleading his claims, he asserts a claim for breach of fiduciary duties and asks for disgorgement, and he asserts that this is an equitable remedy, a finding that, he argues, is sufficient to take this case outside the reach of the rule imposed by <u>Grupo Mexicano</u>. (<u>See</u> Pltff's Reply Memo at 8). Alternatively, the Superintendent contends that Frontier has an equitable interest in the premium funds that constitute the assets that plaintiff seeks to have deposited with the court, thus also permitting the court to freeze those assets by way of a preliminary injunction. (Pltff's Memo at 17; Pltff's Reply Memo at 9-10).

The use in the complaint of the term "disgorgement" may not itself be sufficient to demonstrate that the plaintiff is asserting a claim in equity. The underlying claim -- for breach of fiduciary duty -- seeks in substance an order of restitution, and the Supreme Court has pointed out that restitution, although commonly used as a remedy in equity, may also be utilized in some circumstances as a legal remedy. <u>See</u> <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 212-15 (2002). "'[R]estitution is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case,' and whether it is legal or equitable depends on 'the basis for [the plaintiff's] claim and the nature of the

underlying remedies sought." Id. at 213 (quoting Reich v. Continental Cas. Co., 33 F.3d 754, 756 (7th Cir. 1994)(brackets in Great-West Life)). As summarized by the Supreme Court,

> In cases in which the plaintiff "could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him," the plaintiff had a right to restitution at *law* through an action derived from the common law writ of assumpsit. . . . In such cases, the plaintiff's claim was considered legal because he sought "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money. . . . Such claims were viewed as actions at law for breach of contract (whether the contract was actual or implied).
>
> In contrast, a plaintiff could seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. . . . A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner.

Id. at 213 (emphasis added). In short, the focus appears to be on the nature of the remedy rather than on the legal label that the complaint attaches to the claim. See, e.g., Mertens v. Hewitt Assocs., 508 U.S. 248, 255-59 (1993)(fiduciary-breach claim treated as legal if plaintiff seeks compensatory damages, and treated as equitable if remedy is one traditionally viewed as equitable). See generally Becker v. Poling Transp. Corp., 356 F.3d 381, 390 (2d Cir. 2004)(court looks to facts alleged, rather than legal label,

to determine nature of claim)(citing <u>Kamen v. Kemper Fin. Servs.,</u> <u>Inc.,</u> 500 U.S. 90, 99 (1991)).

Plaintiff meets the test outlined in <u>Great-West Life</u>. The application in the complaint for disgorgement plainly encompasses an equitable form of relief, since the Superintendent is asserting a claim, on behalf of Frontier, of entitlement to a specific fund, that is, the fund that is made up of the proceeds of the insureds' payment of premiums under the PEO program. That equitable interest arises from the terms of the agency contract, which specifies that the premiums funds were to be held by BDS in a separate account and that, except for the commissions owed to BDS, the funds belonged to Frontier. (Agency Agreement § Eight). The same result follows under the New York Insurance Law, which also provides that premiums belong to the carrier. N.Y. Insur. Law § 2120(a); NYCRR tit. 11, § 20.3(b) (2005). <u>See</u>, <u>e.g.</u>, <u>Bohlinger v. Zanger</u>, 306 N.Y. 228, 231-33, 117 N.E.2d 338, 339-40 (1954); <u>In re Great Northern Ass'n v.</u> <u>Curiale</u>, 189 A.D.2d 944, 945, 592 N.Y.S.2d 824, 825 (3d Dep't 1993).

These facts demonstrate the basis for an equitable lien or alternatively a constructive trust. Imposition of an equitable lien requires proof of "a particular agreement by defendants to confer a security interest in the property at issue." <u>Security Pac.</u>

Mortgage & Real Estate Servs, Inc. v. Republic of the Philippines, 962 F.2d 204, 209 (2d Cir. 1992)). A constructive trust also requires identification of a specific res that is linked to the alleged wrongdoing. See Marcos, 806 F.2d at 355; Matter of Weis Secs. Inc., 605 F.2d 590, 597 (2d Cir. 1979). See also Great-West Life, 534 U.S. at 215 ("Whenever the legal title to property is obtained through means or under circumstances 'which render it unconscionable for the holder of the legal title to retain and enjoy the beneficial interest, equity imposes a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same.")(quoting Harris Trust & Sav. Bank v. Salomon Smith Barney Inc., 530 U.S. 238, 250-51 (2000); United States v. Coluccio, 51 F.3d 337, 340-41 (2d Cir. 1995).

The Agency Agreement as well as the pertinent provision of the Insurance Law more than satisfy these requirements. Plaintiff's proffer (including the agency contract and defendant's admission that it has not paid over to Frontier more than three million dollars in premium revenues) identifies the premium funds as property of the carrier and reflects the fact that defendant has concededly declined to transmit those funds to Frontier. In short, plaintiff satisfies the pertinent legal requirements on the current motion for avoiding the bar recognized by Grupo Mexicano.

This conclusion is not altered by the fact that plaintiff asserts legal claims for contract breach, and may be viewed as seeking, at least alternatively, a legal remedy of compensatory damages. Even when a plaintiff asserts multiple claims, some sounding in law and others in equity[9], the court may use its equitable powers to preserve assets if done for the satisfaction of a potential judgment on the equitable claims. See, e.g., ETS Payphones, 408 F.3d at 734; United States ex rel. Rahman v. Oncology Assocs., Inc., 198 F.3d 489, 498 (4th Cir. 1998). See also JSC Foreign Economic Ass'n, 295 F. Supp.2d at 389 & n.10. In this case, there is no question that the freeze or court-deposit order sought by plaintiff is designed to preserve the viability of an equitable final remedy. Indeed, the very basis for the motion is the contention that BDS took into its coffers more than three million dollars in identified premium payments on specified policies, that it placed them in a separate account pursuant to the Agency Agreement, and that it then failed to transmit these funds (less commissions) to Frontier, and indeed misappropriated and dissipated more than 1.5 million dollars of those funds, assertedly for the personal benefit of its principals. Thus the motion is

---

[9] We note that the Federal Rules of Civil Procedure did away with the formal distinction between courts of law and equity, Fed. R. Civ. P. 1, but the Supreme Court in Grupo Mexicano and Great-West Life made clear that for certain purposes, including determining the authority of the trial court to preliminarily enjoin asset transfers, the distinction is still controlling.

designed to protect the viability of the equitable remedy, and it targets specific assets in which Frontier has a claim of title, and this of necessity gives the court the authority to consider an asset-freeze motion. See, e.g., Deckert, 311 U.S. at 290; Republic of Philippines, 806 F.2d at 355-56; see also Sequa Corp., 1995 WL 404726, *4-7 (discussing Marcos, Deckert and DeBeers Consolidated Mines Ltd. v. United States, 325 U.S. 212, 218-23 (1945)).

We recognize one limitation on the foregoing conclusion that the rule of Grupo Mexicano does not bar the plaintiff's motion. As noted, the motion is premised, in part, on the undisputed assertion that BDS has improperly disbursed approximately half of the previously segregated funds to Congressional Re. That disposition of funds necessarily limits the scope of the injunctive remedy that can be imposed on defendant. As the Supreme Court noted in Great-West Life, "where 'the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claims is only that of a general creditor,' and the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant]." 534 U.S. at 213-14 (quoting Restatement of Restitution § 215, Comment a, at 867). See also Sequa, 1995 WL 404726, *8 (citing cases).  Necessarily, then, since the injunctive remedy is limited to identifiable assets still retained by the defendant, any relief in this instance directed at

BDS must perforce be limited to those proceeds not identified as having been dispersed to other entities and individuals, who are not parties to this litigation.[10]

## 2. Application of Preliminary Injunction Criteria

We now turn to the question of whether plaintiff has also met the requirements more generally applicable for the issuance of preliminary injunctive relief. We first consider plaintiff's likelihood of success on the merits and then turn to irreparable harm and other issues.

### (a). Prospects on the Merits

_____

_____Plaintiff is seeking, in effect, restitution or imposition of a constructive trust on funds received by BDS as premium payments from insureds under the PEO program. Although there is considerable disagreement between the parties as to the amounts that might be owed in total under the PEO program, the current motion focuses on four authorized policies issued under the program. There is no

_____

[10] If plaintiff wished to secure the funds that BDS transmitted to Congressional Re and that were then apparently disbursed to Messrs. Black, Black and Haines, he would presumably have to sue them and seek recovery through the imposition of a constructive trust or equivalent remedy. See, e.g., Great-West Life, 534 U.S. at 215 (quoting Harris Trust); id. at 225-27 (Ginsberg, J., dissenting).

dispute on the current record that over a period of time the four insureds[11] paid BDS a total of at least $3,651,935.79, of which BDS paid over to Frontier only $597,000.00. (PX A at 2-4; PX B at 2-5). It is equally clear that BDS transmitted approximately half of these funds –- $1,563,720.03 -- to Congressional Re. (PX B at p. 6; PX F at § 3; PX G). Given the terms of the Agency Agreement and the New York Insurance Law, defendant's failure to transmit these funds (less commissions) to Frontier seems plainly to have violated defendant's obligations under the Agency Agreement and the Insurance Law. Thus, absent some basis for deeming defendant to have been relieved of this obligation, plaintiff is almost certain to succeed on this claim, and hence he satisfies the "likelihood of success" prong of the Rule 65 test. Manifestly, then, plaintiff also satisfies the lesser requirement of the alternative test -- that he show serious issues going to the merits.[12]

---

[11] These insureds are Pro Em, Inc.; Alliance Worldwide, Inc.; Advanced Employer Services, Inc. and Americas PEO. (Weiss Decl. at ¶¶ 9-10).

[12] For purposes of addressing plaintiff's prospects for success on the merits, we do not take into consideration the representations of Mr. Howell, made at our May 6, 2005 conference, as to the transmission of more than 1.5 million dollars from BDS to Congressional Re and from Congressional Re to two of the principals of BDS and to Mr. Haines. We refrain from doing so in deference to the potential argument that Mr. Howell's statements were made in the context of a discussion encompassing the prospects for settlement. See Fed. R. Evid. 408. Nonetheless, for reasons to be noted, Mr. Howell's statements are not barred from use for other purposes, and we do rely upon them in other contexts in this opinion, specifically, when we discuss irreparable harm. See pp. 44-46, infra.

In seeking to avoid this conclusion, defendant presses a host of arguments, none of which we find persuasive. We address them in what we view as an analytically logical order.

Defendant's principal argument seems to be that the Agency Agreement was amended to authorize BDS to transmit funds to Congressional Re. (Deft's Memo at 18-19, 24; Tr. 11-17, 23-28). This argument is baseless, and plainly does not suggest that plaintiff is unlikely to prevail on the merits.

The Agency Agreement specifies that it "may only be revised and/or modified in writing and [the revision or modification] must be accepted by both Company and Agent". The contract further states that "[n]o other change . . . will be valid or binding" and that no "representative of Company or Agent has authority to waive any of the provisions of this Agreement or to modify or change any of its terms . . . except as provided herein." (Agency Agreement, § Thirty Three).

The record reflects no amendment of the Agency Agreement under which BDS would be authorized to transfer premium funds to Congressional Re. Moreover, the one document to which defendant principally points in support of its argument does nothing of the sort.

The document in question is a July 11, 2001 facsimile transmission from Laurie J. Weiss, the program manager of Frontier, to Mr. Howell, in which she discusses the so-called Surge Resources program. (DX 12). That account, however, is not part of the PEO program at issue here. (DX 10; see also DX 12 (Ex. A – estimating premiums but not including Surge); DX 16, 19 (BDS treats Surge and America's PEO as separate accounts). Indeed, the irrelevance of the Surge program is underscored by the fact that the Surge premium payments at that time were to be made directly to Frontier and not through BDS. (See DX 16 at 0056). Moreover, even if we ignore that distinction, the document does not help the defendant.

The evident purpose of Ms. Weiss's communication -- which substantially post-dates the termination of the Agency Agreement -- was to set out Frontier's calculation of premiums due on the Surge program, and in the course of summarizing those computations, Ms. Weiss listed the total of Surge premiums and various expense deductions, including a deduction for payment to the reinsurer. Nothing in the document, however, reflects an instruction by Frontier that BDS should itself pay the reinsurer of the Surge program. Moreover, the document does not refer at any point to the PEO program or to the Agency Agreement at issue here, much less suggest that Frontier wished to amend that contract in any respect, and certainly not to allow BDS to direct premium funds away from

Frontier. Indeed, by that time Frontier was threatening litigation to recover premium funds being withheld by BDS. (See DX 16 at 0057).

The implausibility of defendant's contract-amendment scenario is also underscored by the fact that there is no indication in the record that BDS subsequently apprised Frontier of the fact that it was sending money to Congressional Re (or to any other reinsurer), an accounting obligation that the Agency, as fiduciary, obviously bore. (See, e.g., Agency Agreement §§ Four(c), Eight, Nine, Eighteen). Quite to the contrary, defendant concedes no such communication with respect to the August 2001 transfer (Tr. 17-19), and plaintiff apparently did not learn of that transfer to Congressional Re until the May 2005 conference in this case. (See Pltff's Reply Memo at 12-14; see also Puleio Decl. at ¶¶ 8-14).[13]

In short, there is no evidence whatsoever that the Agency Agreement was amended in the respect that defendant contends. Furthermore, even if such proof could be discerned somewhere in the record, it would not save defendant's position. The premise for defendant's argument is that, by transferring money to

_____

[13] From the submitted documents, it appears that Frontier may have received belated notification of other transfers to Congressional Re and protested them to BDS. (See DX 20 at p.2 (apparently responding to BDS Feb. 7, 2003 fax, a portion of which is annexed as DX 19, although not the pertinent part)).

Congressional Re, BDS was somehow carrying out an obligation of Frontier, but defendant entirely fails to demonstrate that the transmission of more than 1.5 million dollars to Congressional Re in August 2001 satisfied any specified financial obligation owed by Frontier to that company. Moreover, BDS fails as well to demonstrate that its conceded failure to transmit any of the balance of the PEO premium funds to Frontier would somehow have been justified under the Agency Agreement as purportedly amended.

Defendant also challenges plaintiff's prospects for success by pointing out that, after termination, Frontier did modify one other aspect of the Agency Agreement, that is, by instructing BDS in April 2001 that Frontier would thereafter take responsibility for conducting premium audits. (Deft's Memo at 24-25, 28-29, 31-34). This argument too does not put in question the potential viability of plaintiff's claim.

The cited change, which is reflected in a writing from Frontier (DX 20 at p.3; see DX 19), altered the prior contractual arrangement, under which BDS was responsible for conducting such audits. On its face, however, that written notification by Frontier did not purport to alter the requirement that defendant collect premiums as due and transmit them, less commissions, to Frontier. Indeed, Frontier reiterated that very point in a series of

communications to BDS when it terminated the contract and thereafter. Defendant entirely fails to demonstrate any evidentiary basis for concluding that the assumption by Frontier of the auditing function eliminated the obligation of BDS to account for and remit the proceeds of premium payments.[14]

BDS presses a plethora of additional arguments with regard to the merits, not all of them plainly labeled. Nonetheless, we briefly address each identifiable argument in turn.

Defendant asserts that Frontier breached the Agency Agreement in various respects, and it seems to imply that these breaches somehow preclude relief on plaintiff's claim for the premium funds. All of these "breach" arguments suffer from a common flaw. While proof that a party to a contract breached the agreement in some material respect might, in some circumstances, serve as a defense to that party's breach claim, it does not preclude a claim in equity for recovery of a fund earmarked as belonging to the plaintiff or justify a windfall for a dishonest defendant. Indeed,

---

[14] Based on defendant's unverified assumption that, starting in February or March 2003 Frontier began to conduct its own audits and that this relieved BDS of the obligation to collect premiums, defendant offers the further speculation of Mr. Howell that the audits generated large additional premiums paid directly to Frontier, which triggered substantial additional commissions that are owed to BDS. Defendant offers no evidence to support this speculation. (See Tr. 28-29 (discussing DX 12(Ex. A)).

to obtain equitable relief, the plaintiff must ordinarily demonstrate that he has no adequate legal remedy, and the absence of an enforceable contract may satisfy that predicate requirement. See, e.g., R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 60 (2d Cir. 1997); City of Yonkers v. Otis Elevator Co., 844 F.2d 42, 48 (2d Cir. 1988).

Even if we disregard this problem with defendant's approach, the result would not change. None of defendant's arguments about contractual breach justify denial of the plaintiff's motion.

Defendant first says that plaintiff breached the contract by suing in this court. (Deft's Memo at 15-16). The premise for this argument is the fact that the Agency Agreement contains a forum-selection provision that purports to vest exclusive jurisdiction over the parties in the state courts. (Agency Agreement § Twenty).

The filing of suit here by the Superintendent is plainly not a contract breach even if it provided an arguable defense to litigation here. In any event, defendant chose not to assert this defense to the suit or to seek dismissal on that ground, and it has thus waived the argument. Fed. R. Civ. P. 12(h). See also Titan Sports, Inc. v. Hellwig, 1999 WL 301695, *7 (D.Conn. April 26, 1999); Rogen v. Memry Corp., 886 F.Supp. 393, 396 (S.D.N.Y. 1995).

Furthermore, plaintiff's forum choice has nothing to do with whether Frontier was entitled to receive the premium payments that insureds made to BDS, and it can scarcely justify a result that would leave defendant in possession of funds to which it is not otherwise entitled.[15]

Defendant next argues that the Agency Agreement was void _ab initio_ or otherwise unenforceable by Frontier because the contract provided for automatic termination when either party became insolvent. (Deft's Memo at 27-29). As defendant notes, plaintiff has represented in this litigation that Frontier was in fact insolvent prior to the execution of the agreement. (Conolly Decl. at ¶¶ 22, 24, 28).

The short answer is, again, that this argument does not preclude a claim in equity for recovery of funds to which BDS has no lawful entitlement. The parties entered into an agency relationship -- whether with or without the benefit of a valid written contract -- and as a result pursued a business arrangement by which Frontier became legally bound as an insurer to a number of insureds, and as a consequence BDS received substantial funds

---

[15] In this and other arguments, defendant is, in substance, quarreling with the court's decision to stay the counterclaims. (See Deft's Memo at 16). That decision, however, is law of the case, and defendant has offered no basis to revisit it.

representing premium payments intended to compensate Frontier for its coverage. Under these circumstances, whether or not Frontier was insolvent when the Agency Agreement was executed, BDS is obligated as a fiduciary to account for these funds and to transmit to the carrier the premiums that it received on account of the insurance program that it managed for Frontier.[16] To do otherwise would result in a classic case of unjust enrichment.

Defendant next argues that Frontier was obligated, under its reinsurance agreement with Congressional Re (DX 11), to forward a portion of the premiums to the reinsurer, and if it failed to procure reinsurance it was obliged to transmit most of the premiums to Congressional Re, leaving it with only fifteen percent of the premium funds. (Deft's Memo at 18). Defendant seems to say that it provided funds directly to Congressional Re, thus fulfilling Frontier's obligation, and that this somehow precludes Frontier's recovery of the premiums, as sought by plaintiff. (Id. at 18-21).

This argument is seriously misguided. In effect BDS seems to be saying that it was obliged to remit payments to Congressional Re to ensure that that company paid claims on policies in the program,

---

[16] As noted, the Agency Agreement itself specifies that, upon termination, the parties were still required to carry out their responsibilities with respect to still-pending business (Agency Agreement § Twenty-Five(I) & (K)), a requirement inherent in the circumstances as well as spelled out in the contract.

and that it should not be held liable for this conduct, which was necessary to ensure that the program continued to function. Defendant's argument is entirely unsupported by the record.

The only payment by BDS to Congressional Re that has been documented is the August 2001 transfer of more than 1.5 million dollars, and there is no evidence that those funds were used to pay off policy claims rather than being promptly funneled into the pockets of the principals of BDS and their business associate, Mr. Haines. Although defendant attempts to support its contention that some funds were spent by an entity named Congressional Management to pay off PEO program claims (Deft's Memo at 20-21; Tr. 20), it offers no competent evidence either of this fact or of its implicit contention that moneys that BDS siphoned to Congressional Re were used for such payments. (See, e.g., Tr. 20 (conceding that use of moneys sent by BDS to Congressional Re is "foggy territory"). Indeed, the one document that defendant cites (DX 15) -- apart from being unauthenticated -- indicates only that at a certain point in late November 2001 Mr. Haines issued some small indemnity checks to insureds at the request of Frontier because the insurer did not have the claims in its computer system and was temporarily unable to issue manual checks.[17] There is nothing in this proffer that

---

[17] The payments listed in the e-mail (except for some small Surge payments) total approximately $2,000.00. (DX 15).

shows any conceivable justification for BDS to withhold more than three million dollars from Frontier.

Finally, this argument can be read as an attempt by BDS to implicitly assert a claim by Congressional Re for non-payment under its reinsurance contract with Frontier. If that is what defendant intends to argue, the simple answer is that Congressional Re is not a party to this lawsuit, and defendant has no standing to assert a claim on its behalf.

BDS next complains that plaintiff has improperly declined to answer some written discovery requests, and it has just recently written to the Court asking for its assistance with various discovery disputes. (Dec. 29, 2005 letter to the Court from William Chapman, Esq.). However, defendant fails to suggest how the discovery objections by plaintiff in any way undercut his current motion. We see no connection between the still-nascent discovery dispute –- such as it is -– and an assessment of the relevant evidence pertaining to the current motion.

Defendant next complains that Frontier's parlous financial condition when it entered into the Agency Agreement prevented it from adequately staffing the PEO program and properly underwriting the PEO policies "in accordance with its underwriting guidelines."

(Deft's Memo at 21). More particularly, BDS says that Frontier falsely represented at the time of contracting that "it was authorized to, and capable of, acting as the fronting insurer for the subject program." (Id. at 22). Noting what it colorfully terms Frontier's "death spiral", defendant complains -- entirely without specification -- that Frontier performed inadequately as an underwriter. In support of this contention BDS says only that Frontier refused to meet with BDS at various times in 2001 "to address underwriting issues." (Deft's Memo at 22).

The exact nature of defendant's legal theory is obscure. To the extent that defendant may be complaining that Frontier fraudulently induced it to enter into the Agency Agreement, that is a claim that may be asserted in the rehabilitation proceeding, but is not at issue here. In any event, BDS proffers no evidence to demonstrate that the carrier's financial status caused BDS any injury, and its reference to Frontier's refusal to meet to discuss "underwriting issues" is entirely immaterial to any claim now in this lawsuit.[18] Finally, whether or not it was prudent of Frontier to decline to meet with BDS personnel about the parties' seemingly conflicting accounts of the amounts owed under the PEO program does

---

[18] It also bears mention that, judged by the records proffered by BDS, Frontier was in frequent, if irritated, communication with BDS throughout the relevant period, repeatedly complaining about the lack of key documentation from BDS. (See, e.g., DXs 10, 15-21, 24, 26, 27).

not affect the question of whether defendant has failed to turn over funds to Frontier that belong to the carrier. In effect, defendant is complaining about the unwillingness of Frontier to resolve the dispute voluntarily -- a path that Frontier assertedly followed because BDS did not provide it required documentation -- but that interaction is irrelevant to the issues posed by the current motion. Frontier and the Superintendent chose ultimately to resolve Frontier's disputes with BDS through litigation, and plaintiff will bear the burden of proving his claims in court. If plaintiff can demonstrate that BDS owes Frontier money, he will prevail.

Defendant next reiterates its complaint that Frontier falsely warranted its ability to underwrite the PEO program, and it claims that this misrepresentation induced BDS to enter into the agency arrangement with the carrier, with the result that BDS now faces a variety of lawsuits by unhappy or defrauded policyholders even though Frontier itself cannot be held responsible for such liability because of its insolvency. (Deft's Memo at 22-23). This argument is also a non sequitur, since the appropriateness of granting injunctive relief based on defendant's alleged withholding of premium funds has nothing to do with the question of whether BDS was misled into signing a contract with Frontier. If defendant chose to assume fiduciary responsibilities, it may be held to those

obligations, and cannot use its status as a defendant in other lawsuits to justify retaining the funds that were set aside for Frontier's benefit.

Defendant next asserts another variant of its "breach by Frontier" defense theory, arguing that the carrier failed to comply with its obligation "to maintain licenses and certificates of authority as an insurance company in the states to which the program applied during the term of the agreement." (Deft's Memo at 23). Defendant offers no evidence of such a lapse of licensing nor any explanation as to how that affected the parties' respective rights in the premium funds. Indeed, defendant adverts simply to the fact that Frontier reported in March 2001 that it was withdrawing from the insurance business, a fact that is both undisputed and irrelevant to plaintiff's motion.

BDS next argues that the relief sought by plaintiff on the current motion would violate a provision of the Agency Agreement that Frontier would indemnify BDS and hold it harmless for all liability or damages resulting from acts or omissions of a Frontier employee. (Deft's Memo at 23). This argument misses the mark. Defendant's right to indemnification would have to be asserted as a claim in the rehabilitation proceeding, not here, and in any event defendant offers no evidence that its potential liability in

lawsuits pending in other courts is a result of misconduct or tortious acts by an employee of Frontier. Finally, any potential liability of this sort by Frontier is simply irrelevant to the claims pending in this lawsuit and to the appropriateness of granting injunctive relief here to ensure the viability of an equitable remedy to which plaintiff is likely to become entitled at the conclusion of the case.

In its following argument, defendant suggests, "on information and belief", that Frontier may not have fulfilled its obligation to obtain reinsurance. It then observes that if reinsurance lapsed, Frontier was required to, and did not, provide prompt notice to BDS. Defendant goes on to say that the question of whether Frontier obtained and maintained reinsurance is crucial to determining who breached the Agency Agreement, and may substantially affect the extent of the monies owed to Frontier. (Deft's Memo at 23-24). Defendant further complains that plaintiff has refused to answer discovery requests on the question of reinsurance. (Id. at 24).

Defendant's arguments again are entirely unconvincing. First, even if Frontier failed to obtain reinsurance coverage or to give notice of a lapse of such coverage, and even if such a failing may affect the scope of recoverable damages under plaintiff's contract claim (provided that defendant can demonstrate that the failure by

Frontier caused it monetary injury)[19], that does not alter or undermine Frontier's entitlement to premium funds that were set aside for it. Second, the underlying point pressed by defendant is, in substance, that Frontier may owe additional monies to Congressional Re under its reinsurance agreement with that entity. However, Congressional Re is not a party to this lawsuit and BDS does not stand in its shoes for purposes of asserting a claim on its behalf. Third, defendant offers no shred of evidence to support its "on information and belief" contention that Frontier breached its payment obligations to Congressional Re. Fourth, defendant's vague complaints about plaintiff's performance in discovery ring quite hollow as an excuse for not providing any evidence of a failure to purchase reinsurance coverage. As noted, plaintiff was to obtain that coverage from Congressional Re, the principals of which include Tim and Tom Black, who are also principals of BDS. In short, there is no doubt that defendant has access to information about the extent of the reinsurance coverage obtained by Frontier, and yet BDS offers no evidence in support of its vague speculation or conclusory assertion.

In sum, we conclude that plaintiff has shown a likelihood of

---

[19] The Agency Agreement itself does not include a specific provision requiring Frontier to obtain reinsurance, but it does state that the agreement will lapse upon termination of reinsurance. (Agency Agreement § Five(D)).

success on the merits of his claim for a breach of fiduciary duty. We also find, in the alternative, that plaintiff has demonstrated substantial issues going to the merits of the same claim.

(b). <u>Irreparable Harm</u>

We next turn to the question of whether plaintiff has demonstrated a sufficient prospect of irreparable harm to justify the injunctive relief that he seeks. A movant in plaintiff's situation may satisfy this requirement by showing "a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." <u>Brenntaq Int'l Chemicals, Inc. v. Bank of India</u>, 175 F.3d 245, 249 (2d Cir. 1999). A serious threat of insolvency by a defendant can constitute such a "substantial chance" of irreparable harm. <u>See</u>, <u>e.g.</u>, <u>Castle Creek Technology Partners LLC v. Cellpoint Inc.</u>, 2002 WL 31958696, *3-4 (S.D.N.Y. Dec. 9, 2002); <u>Netwolves Corp. v. Sullivan</u>, 2001 WL 492463,*1 (S.D.N.Y. May 8, 2001); <u>Federated Strategies Inc. Fund v. Mechaka Group Jamaica Ltd.</u>, 1999 WL 993648, *8 (S.D.N.Y. Nov. 1, 1999). We conclude that plaintiff has satisfied this requirement.

The first source of evidence of potentially irreparable harm arises from the fact that defendant has concededly disbursed a substantial portion of the funds dedicated to the benefit of

Frontier and did so for the evident benefit of the principals of the defendant. That conduct, although it took place more than four years ago, raises a serious concern that defendant is continuing to drain those funds, particularly in view of the threat of judgments being entered against it in this and other pending lawsuits in which BDS is a defendant.

In making these findings we note that a question has arisen as to whether one significant portion of the record on which we rely may be properly considered in this analysis. Specifically, the details of the diversion of funds from BDS to Congressional Re and thence to Messrs. Black, Black and Haines was first reported by Mr. Howell at a conference with the court conducted in May 2005. The conference addressed, in part, the status and scheduling of the case, but the court also asked about the prospects for settlement of the matter, and it was presumably for purposes of discussing the settlement question that Mr. Howell was present for the defendant. Arguably, then, Mr. Howell's statements, which were in response to a series of questions posed by the court, could be viewed as "statements made in compromise negotiations", a status that, under the terms of Fed. R. Evid. 408, would limit their use.

Howell's statements about the disposition of the premium funds do not come within the literal language of Rule 408, since he did

not make them "in compromise negotiations".[20] Nonetheless, we treat them for present purposes as sufficiently related to the concerns of the rule to trigger coverage by Rule 408. That said, the rule does not preclude the admission of such statements for all purposes. Rather, it provides that statements made "in . . . attempting to compromise a claim which was disputed as to either validity or amount" may not be admitted "to prove liability for or invalidity of the claim or its amount." At the same time, however, the rule does not require exclusion if "the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."  This list of exceptions is not exhaustive, but rather only illustrative. As the Advisory Committee Notes for the 1972 proposed rule observe, "Since the rule excludes only when the purpose is proving the validity or invalidity of the claim or its amount, an offer for another purpose is not within the rule." Fed. R. Evid. 408, 1972 Advisory Committee Notes at 398 (McKinneys 2005 Rev. Ed.). Accord, e.g., Starter Corp. v. Converse, Inc., 170 F.3d 286, 293 (2d Cir. 1999); In re Subpoena Issued to Commodity Futures Trading Comm'n, 370 F. Supp.2d 201, 211 (D.D.C. 2005)(quoting inter alia 2 Weinstein's Federal Evidence §

---

[20] No such negotiations occurred at the conference, although the court inquired about the posture of the case with a view to determining whether court-supervised negotiations were feasible at that point.

408.07 at 408-26 (2005)).[21]

For present purposes we are not relying on Mr. Howell's statements about the disposition of the premium funds to assess the strength of plaintiff's claims. Rather, we look to them as evidence pertaining to the likelihood of irreparable harm to the Frontier estate if preliminary injunctive relief is denied. That use is plainly beyond the prohibitory scope of the rule, and hence we are free to take Mr. Howell's statements into consideration. See, e.g., Sequa, 1995 WL 404726, *10 & nn. 7, 10 (relying on statements in settlement conference to demonstrate knowledge of asset dissipation, and hence unjustifiable delay in seeking asset freeze); accord Richard B. Roush, Inc. v. New England Mut. Life Ins. Co., 166 F. Supp.2d 187, n.10 (M.D. Pa. 2001)(negotiation statements admissible to defend against assertions of undue delay), rev'd on other gds., 311 F.3d 581 (3d Cir. 2002). See also Southwest Nurseries, LLC v. Florists Mut. Ins., Inc. 266 F. Supp.2d

---

[21] The rule also specifies that it "does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." Although that provision could arguably apply to factual statements by a client -- such as the statements of Mr. Howell -- the Advisory Committee Notes indicate that that provision was concerned with the disclosure of documents during settlement negotiations, and that the protections afforded by the rule as enacted extend to purely factual oral statements by a party during negotiations. See Fed. R. Evid. 408, 1974 Advisory Committee Notes at 398-99 (McKinneys 2005 Rev. Ed.).

1253, 1257 (D. Colo. 2003)(same).[22]

Howell admitted that BDS had transferred the funds to Congressional Re, and that representation has since been confirmed by BDS in response to interrogatories posed by the plaintiff. Howell further represented that the funds had then been disbursed by Congressional Re to Messrs. Black, Black and Haines, and that those payments were originally labeled as dividends, and then subsequently re-characterized as loans. (Puleio Decl. at ¶¶ 8-12). The balance of the record confirms the transfer of funds from BDS to Congressional Re and a set of loans from Congressional Re to these three individuals (DX 22), although defendant has not directly addressed the provenance of these loans, while also carefully not contradicting Howell's account. Hence, we conclude that such a diversion of the premium funds to the principals of BDS and to their business associate did in fact occur, a circumstance

---

[22] Defendant also argues against reliance on Mr. Howell's statements based on the conclusory suggestion that he may not have had personal knowledge about the transactions in question. (Tr. at 58). The short answer to this assertion is that Mr. Howell was a senior official of BDS who, as judged from the documentation supplied by defendant on this motion, was the person in charge of handling all aspects of defendant's involvement in the PEO program, and he was thus the person chosen by BDS to represent it at the conference on this case. Under these circumstances, his statements can plainly be deemed party admissions. Moreover, this conclusion is strongly fortified by defendant's apparently studied decision not to offer any evidence on this motion impeaching the accuracy of Howell's representations to the court.

that in itself suggests a significant danger of further such diversions.[23]

The balance of plaintiff's case for irreparable harm is based on the contention that there is a real danger that defendant will be unable to satisfy a final judgment in this case. That assertion is premised principally on representations made by defendant only two months ago in opposing plaintiff's motion for a stay. In an affidavit by Mr. Howell, defendant represented that if judgment were entered in the amount sought by plaintiff, BDS could not survive financially. (PX H at ¶ 19). In addition, defendant asserted that if its counterclaims were stayed in this proceeding, the company would also face a potentially fatal financial crisis. (Deft's Stay Memo at 15). The stay was granted, and these representations by BDS in opposing that relief provide significant warning flags about defendant's ability to survive financially to the end of this case.

In resisting this conclusion, defendant asserts that plaintiff misreads the Howell affidavit since he was only referring to the

---

[23] We have noted that the diversion occurred a long time ago, but it appears that plaintiff and Frontier were not aware of the diversion until Mr. Howell revealed it at the May conference, a suggestion seemingly confirmed by the concession of defendant's counsel that there is no evidence that BDS ever advised Frontier of this transfer.

eventuality -- which defendant asserts is remote -- that a judgment of eight million dollars will be entered against BDS. (Deft's Memo at 31-33). What is striking about defendant's argument, apart from its attempt to diminish the breadth and implications of its assertions on the stay motion, is that BDS has failed to offer a scintilla of evidence to contradict the inference that plaintiff is inviting us to draw from defendant's earlier statements concerning the financial status of the defendant. Compare, e.g., Meringolo v. Powers2ship, 2003 WL 21750009, *3-5 (S.D.N.Y. July 28, 2003)(defendant offered accountant's testimony).

We also note a series of other circumstances that support plaintiff's contention that it may have an unenforceable judgment if the preliminary injunctive relief that it seeks is not granted. These include the previously noted fact that BDS is being sued in a number of courts around the country by entities that believed that they had purchased bona fide insurance coverage under the PEO program, and it thus faces the prospect of judgments being entered against it for significant sums. (PX H at ¶ 19).[24] In addition, the very pendency of these lawsuits also reflects a continuing drain of resources from BDS, since its insurance carrier has declined coverage and thus refuses either to defend or to indemnify

_____

[24] Indeed, defendant repeatedly invokes this specter in arguing the unfairness of plaintiff's application for interim relief.

defendant for any liability. (PX I).

These facts suffice to demonstrate a sufficient prospect of irreparable harm to plaintiff absent injunctive relief. Thus we have no need to rely upon the fact -- asserted by plaintiff -- that Mr. Howell has filed for personal bankruptcy protection and named BDS and its principles, as well as the allegedly defrauded insureds, as creditors.[25]

Finally, we briefly address defendant's argument that the plaintiff has unduly delayed in seeking relief and hence should be deemed not to face irreparable harm. (Deft's Memo at 35-36). Significant delay in seeking a preliminary injunction has long been recognized as a factor weighing against an assertion of irreparable harm on a Rule 65 motion. See, e.g., Citibank N.A. v. Cititrust, 756 F.2d 273, 276 (2d Cir. 1985)(citing cases); Majorica, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985). Moreover, contrary to plaintiff's implicit suggestion (Pltff's Reply Memo at 14), that principle is not confined to trademark or similar claims, and has in fact been applied in a broad array of civil cases. See Sequa, 1995 WL 404726, *13 n.7 (citing inter alia Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel, 872 F.2d 75, 79-80 (4th Cir. 1979);

---

[25] In any event we are unclear as to the relevance of these facts.

Nassau Boulevard Shell Serv. Station v. Shell Oil, 869 F.2d 23, 23-24 (2d Cir. 1989); Costello v. McEnery, 767 F. Supp. 72, 78 (S.D.N.Y.), aff'd, 948 F.2d 1278 (2d Cir. 1991); Silverman v. Local 3, Int'l Bhd. Elec. Workers, AFL-CIO, 634 F.Supp. 671, 673 (S.D.N.Y. 1986)).

The problem with defendant's delay argument is that the factual record does not support the contention that plaintiff has unduly delayed seeking relief in this context. Plaintiff apparently first learned of the diversion of moneys from the premium fund at the May 2005 conference. As noted, that suggestion by plaintiff is particularly plausible in view of the concession by defendant's counsel that there is no evidence that BDS provided any notice of this transfer to Frontier.[26]

As for the passage of time from May to November 2005, when plaintiff finally sought relief, that delay is somewhat more troubling. Nonetheless, at least a significant portion of this time

---

[26] We note that in 2001 an attorney for BDS advised Frontier that defendant was considering whether to turn premium funds over to Congressional Re (DX 14), but the letter explicitly stated that defendant would notify plaintiff of its decision as to how to dispose of premium funds, and there is no indication that defendant's attorney ever followed up. The record also contains a 2003 letter from Frontier to BDS in which Frontier advised that BDS had no authority to make any payments to Congressional Re, but it is not clear from the context whether Frontier had learned of any such transfers at that time. (DFX 20 at p.2).

lag is apparently attributable to plaintiff's efforts to obtain discovery as to the details of the transactions to which Mr. Howell had alluded. Such confirmation through discovery was necessary since there was a serious question as to whether Howell's statements could themselves be used in support of a freeze motion.[27] As it turned out, the interrogatory answers pertinent to this question were not finally received until October.

The additional key facts supporting the current motion -- based principally on defendant's admission of its fragile financial condition -- were also not available to plaintiff until October 2005, when defendant filed its papers in opposition to the stay motion. Since Howell's statements about dissipation were potentially not usable, this information about defendant's finances was essential to demonstrate the prospect of irreparable harm.

Finally, we note that extended and unjustified delay, while pertinent to the irreparable-harm question, is not necessarily dispositive, particularly in the absence of any demonstrated prejudice to the defendant. <u>See</u>, <u>e.g.</u>, <u>Castle Creek</u>, 2002 WL 31938696, *5. In this case, the significant justification for much of the passage of time, the compelling equities that favor

---

[27] Thus, we have determined not to use those statements in analyzing plaintiff's argument as to the likelihood of its success on the merits. (<u>See</u> p. 25, n.12, <u>supra</u>).

preliminary injunctive relief and the lack of any evidence of prejudice to defendant flowing from the delay, justify the conclusion that plaintiff's motion should not be denied based on that delay.

C. <u>Balance of Hardships</u>

_____In the interest of completeness, we address the alternative test for evaluating applications for preliminary injunctive relief. As noted, the movant must demonstrate serious issues going to the merits, irreparable harm, and a balance of hardships tipping decidedly in favor of the movant. <u>Consolidated Rail Corp.,</u> 47 F.3d at 478-79 . We have found that plaintiff satisfies the first two criteria, and we turn now to the third.

As we have found, a judgment of some amount is likely to be entered in plaintiff's favor, and plaintiff bears a significant risk that defendant's assets will prove inadequate to satisfy such a judgment. In considering the other side of the balance -- that is, the degree of hardship that defendant is likely to encounter from the type of injunctive order sought by plaintiff -- we look in vain for evidence in the record demonstrating in any meaningful way what hardship defendant faces if the injunction is granted. From defendant's submission on the stay motion, we infer that its

financial condition is not robust, and it faces the potential for substantial demands on whatever fiscal resources it may have at the moment, but we have no specification either of its assets or of the portion of those assets that represent premium payments attributable to the PEO program.

Defendant was free to attempt to make a showing of hardship on this motion, but failed to do so. Moreover, we attribute the absence of any such data to a tactical decision by defendant, possibly reflecting concern that specific details might undermine its argument that plaintiff faces no irreparable harm or perhaps out of concern that a detailing of its finances might reveal a further dissipation of premium funds belonging to Frontier. In any event, on the current record we cannot avoid the conclusion that the balance of hardships tips decidedly in favor of the plaintiff, a conclusion further fortified by the likelihood that defendant's coyness about its finances implies that it is now relying significantly for its financial health on assets belonging to Frontier. If so, it cannot invoke the loss of the use of those assets as harm that the court may take into account in determining the propriety of equitable relief at this time.

_____

D. Public Policy Considerations

Apart from determining whether the movant has satisfied the specific requirements for granting preliminary injunctive relief, the court may properly consider other factors in determining whether and how to exercise its equitable authority. See Yakus v. United States, 321 U.S. 414, 440-41 (1944); Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989). In this case, even if we considered the question to be otherwise a close one, significant public policy concerns counsel in favor of granting relief.

As we noted in granting a stay, the provisions of the Insurance Law that authorize the Superintendent of Insurance to trigger a rehabilitation proceeding embody a strong public policy in favor of ensuring the survival of any insurance carrier that is in financial peril. That concern reflects the need to protect policy holders from default by the carrier, a circumstance that could imperil the financial health of the State's economy and place on the State a substantial financial burden if it were called upon to become an insurer of last resort. See Superintendent of Ins. of State of N.Y. v. Bankers Life & Casualty Company, 401 F.Supp. 640, 644 (S.D.N.Y. 1975).

These concerns are reflected in the statutory directive that, in a rehabilitation proceeding, the Superintendent be assigned broad powers to marshal the assets of the carrier's estate. N.Y. Insur. Law § 7406. It finds further reflection in the statutory provision authorizing the rehabilitation court to enjoin all assertions of claims against the carrier except in the rehabilitation forum. N.Y. Insur. Law § 7419(b).

These concerns counsel in favor of the conclusion that when the assets of a carrier's estate are in peril by virtue of another entity's refusal or inability to preserve the assets for the benefit of the estate, a court of equity should be strongly disposed to step in and taking necessary measures to ensure the preservation of those assets. That appears to be the case here, and accordingly we will act.

C. The Remedy

For the foregoing reasons and pursuant to Fed. R. Civ. P. 65, it is hereby ORDERED, that pending a final decision on the merits of plaintiff's claims, BDS place in the registry of the court, by no later than January 6, 2006, the entire balance of the premium funds that were received by BDS for the benefit of Frontier on the policies issued to Pro Em, Inc., Alliance Worldwide, Inc., Advanced

Employer Services, Inc. and Americas PEO. This sum should total no less than $1,491,215.76. For reasons noted, this figure does not include the amounts transferred by BDS to Congressional Re in August 2001, but it does include the ten percent that would ordinarily be payable to BDS under the Agency Agreement as a commission. We require that the full amount of the remaining funds, without a credit for commissions, be deposited because (a) it is likely that BDS will be found to have been an unfaithful fiduciary and hence potentially subject to forfeiture of commissions for the period of such alleged dishonesty, see e.g., Phansalkar v. Andersen Weinroth & Co., 344 F.3d 184, 200-09 (2d Cir. 2003); Musico v. Champion Credit Corp., 764 F.2d 102, 112-13 (2d Cir. 1985), and (b) the premium funds still available for freezing have already been substantially reduced from the full amount that was obligated to Frontier, a shortfall apparently attributable to the improper disbursement by BDS of more than 1.5 million dollars to Congressional Re, for the benefit of the principals of BDS.

It is further ORDERED that BDS is enjoined, during the pendency of this lawsuit, from spending, transferring or otherwise disbursing any other funds that it has received, or will receive, at any time as premium payments under the PEO program, except upon notice to and with the consent of the plaintiff or the court.

It is further ORDERED that BDS is to provide a monthly statement to the plaintiff that accounts for the receipt of any such funds.

Fed.R.Civ.P. 65(c) provides that:

> No restraining or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

The Second Circuit has held that in any case "[t]he phrase 'in such sum as the court deems proper' indicates that the District Court is vested with wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm. . . " Doctor's Assocs. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996) (quoting Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir. 1961)).

BDS has not made any showing suggesting potential harm, or the likely extent of it, from the requirement that it place the PEO funds in the control of the court, in an interest-bearing account. Moreover, counsel for the plaintiff has represented that the satisfaction of any valid claims for injury flowing from an improperly issued preliminary injunction would be an obligation of

the circumstances we decline at this time to require the posting of

a bond in conjunction with this preliminary injunction.

Dated: New York, New York
       December 30, 2005

SO ORDERED

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Memorandum and Order have been mailed today
to:

William S. Gyves, Esq.
Entwhistle & Capucci LLP
299 Park Avenue
New York, New York 10171

William D. Chapman, Esq.
Christine C. Hession, Esq.
Melick, Porter & Shea, LLP
28 State Street
Boston, Massachusetts 021099-1775

John E. Lawlor, Esq.
129 Third Street
Mineola, New York 11501